595-07/WLJ/DJF
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SAMSUN LOGIX CORPORATION
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

William L. Juska, Jr. (WJ 0772)
Daniel J. Fitzgerald ( DF 6313)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SAMSUN LOGIX CORPORATION,

               Plaintiff,

      -against -

SEKIHYO LINE LTD. ,

              Defendant.
------------------------------------------------------------x



JUDGE SWEET

07 cv CV 10667

**VERIFIED COMPLAINT**

Plaintiff SAMSUN LOGIX CORPORATION ("SAMSUN"), by and through its

attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant

SEKIHYO LINE LTD ("SEKIHYO"), alleges upon information and belief as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure. The case also falls within this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. §1333, *et seq.* and / or the Arbitration Act, 9 U.S.C. §1 *et seq.*

and /or §201 *et seq.* and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

2.     At all times relevant hereto, Plaintiff SAMSUN was and still is a business entity

organized and existing under the laws of Korea with a place of business at 5, 6f, Lee Ma Bldg.,

146-1, Soosong-dong, Chongno-ku, Seoul, Korea.

3.     At all times relevant hereto, Defendant SEKIHYO was and still is a business entity organized under the laws of a foreign country with an office located at 1-1-1 Minami Aoyama, Minato-Ku, Tokyo, Japan, 107-0062 and/or at Shinaoyama Building, Higashi-Kan 1907, Minato-Ku, Tokyo, Japan.

4.     On or about March 16, 2005, Plaintiff SAMSUN, as charterer, and Defendant SEKIHYO, as disponent owner, entered into a maritime contract of charter party on a New York Produce Exchange form for the use and operation of the M/V BENEFIT WISDOM ("the Charter Party").

5.     The Charter Party was to be for a period of "minimum 11 months/maximum 13 months, or in charterers' option, minimum 24 months/maximum 26 months" at a daily hire rate of $14,950 in the case of a charter period of 11/13 months or a daily hire rate of $13,200 in case of a charter period of 24/26 months. A copy of the charter party is attached hereto as Exhibit A.

6.     By Addendum No. 3 dated October 16, 2006, Plaintiff SAMSUN and Defendant Sekihyo extended the term of the charter party by one year at a daily rate of hire of $12,550, with redelivery to occur between the end of April/end of June 2008. A copy of Addendum No. 3 is attached hereto as Exhibit B.

7.     On or about February 14, 2007 Plaintiff SAMSUN entered into maritime contract of charter party whereby it sub-chartered the M/V BENEFIT WISDOM to JH Shipping Co. Ltd. for a period  "min/max 7/9 mos" at a daily hire rate of  $13,700.  The vessel was to remain on charter to JH Shipping Co. Ltd. until September 27, 2007.

8.     Sub-charterer JH Shipping Co. Ltd. further sub-chartered the M/V BENEFIT WISDOM to TKB Shipping of Denmark.

9.      On or about September 5, 2007 Plaintiff SAMSUN entered into a maritime contract of charter party whereby it sub-chartered the M/V BENEFIT WISDOM to Dooyang, at a daily rate of hire of $21,800, the vessel to be delivered into Dooyang's service in October/November 2007, following completion of the sub-charter with JH Shipping Co. Ltd.

10.     Sub-charterer Dooyang further sub-chartered the M/V BENEFIT WISDOM to Chang Sung Shipping.

11.     Pursuant to the terms of the Charter party, Plaintiff SAMSUN performed all of its obligations, including making timely payments of hire. However, on September 10, 2007, in violation of the terms of the Charter Party, Defendant SEKIHYO notified SAMSUN that it was withdrawing the vessel from the charter party. Furthermore, although notice of withdrawal was only given on September 10, 2007, the Master of the M/V BENEFIT WISDOM ceased following the orders of the sub-charterers on September 6, 2007.

12.     As a result of SEKIHYO's breach in wrongfully withdrawing the M/V BENEFIT WISDOM from SAMSUN's service under the charter party dated March 16, 2005, SAMSUN has sustained damages.

13.     SAMSUN, due to SEKIHYO's wrongful conduct, has sustained damages in the sum of $2,288,958.95, as follows:

    A.  Overpayment of hire to SEKIHYO for 23.208333 days until September 30, 2007 - $291,264.58

    B.  Loss of the bunkers (fuel) on board the vessel at the time of withdrawal, the value of which SEKIHYO was obligated to reimburse SAMSUN under the terms of the charter party:

        Intermediate Fuel Oil - 679.19 metric tons - $272,355.19

Marine Deisel Oil – 56.90 metric tons -        $42,219.80

C.   Overpayment of monthly fee under terms of chartrer party for communications, victualing and entertainment -  $1500 per month x 23.208333 days =  $1,160.42

D.   Loss of earnings on the sub-charter to JH Shipping Co. Ltd. - $81,395.21

E.   Loss of earnings on the sub-charter to Dooyang - $1,600,563.75

Against these losses totaling $2,288,958.95 Defendant SEKIHYO is entitled to credits totaling $246,607.51, leaving SAMSUN with net damages of $2,042,351.44.

14.     In addition, the wrongful withdrawal of the M/V BENEFIT WISDOM by SEKIHYO caused SAMSUN to be unable to fulfill its obligation to provide the vessel to sub-charterer JH Shipping Co. Ltd..  Sub-charterer JH Shipping Co. Ltd. has submitted to SAMSUN claims for damages totaling $2,006,814.10, for which SAMSUN will be liable under the charter party with JH Shipping dated February 14, 2007.  JH Shipping's claims are for overpaid hire and the value of bunkers onboard ($401,059.10), loss of earnings on its sub-charter with TKB Shipping ($290,915.63),  and indemnity claims for TKB Shipping's claims against JH Shipping for loss of earnings ($968,296.87) and a detention charge due to a detention of the vessel at the port of Teesport ($378,000). A copy of JH Shipping's statement of claim is attached as Exhibit C.

15.     Further, the wrongful withdrawal of the M/V BENEFIT WISDOM by SEKIHYO caused SAMSUN to be unable to fulfill its obligation to deliver the vessel to sub-charterer Dooyang, which SAMSUN was obligated to do following completion of its sub-charter contract with JH Shipping Co. Ltd.   Sub-charterer Dooyang has submitted to SAMSUN claims for damages totaling $2,305,350.00, for which SAMSUN will be liable under the charter party with Dooyang dated September 5, 2007. Dooyang's claims are for loss of earnings on its sub-charter

with Chang Sung Shipping ($505,350), and an indemnity claim for Chang Sung Shipping's claim against Dooyang for $1,800,000.00 representing the hire differential between its hire rate under its chartrer with Dooyang ($25,000 per day) and the market rate ($35,000) at the time of the wrongful withdrawal by SEKIHYO. A copy of an e-mail dated October 25, 2007 from Dooyang's chartering broker, J.B. Chartering Corp., sets forth Dooyang's claims and is attached as Exhibit D.

16.    Plaintiff SAMSUN has demanded payment from SEKIHYO for the aforementioned outstanding claims. Despite having made due demand, however, Defendant SEKIHYO, in breach of the Charter Party with SAMSUN, refused or otherwise failed to pay. A copy of SAMSUN's Claim Invoice in the amount of $6,354,525.54, which has been submitted to SEKIHYO, is attached as Exhibit E.

17.    The Charter Party dated March 16, 2005 between SAMSUN and SEKIHYO provides that it is to be governed by English law and that all disputes between the parties are to be resolved by arbitration in Singapore. Plaintiff SAMSUN expressly reserves herein its right to arbitrate the merits of its claims against SEKIHYO in accordance with the agreement of the parties.

18.    This action is brought to obtain jurisdiction over the Defendant SEKIHYO and to obtain security in favor of Plaintiff SAMSUN in respect to its claims against SEKIHYO and in aid of Singapore arbitration proceedings.

19.    This action is further brought to obtain security for any additional sums to cover Plaintiff SAMSUN's anticipated costs in the arbitration and interest, all of which are recoverable under English law and the statutes and rules applicable to Singapore arbitration.

20. Upon information and belief, and after investigation, Defendant SEKIHYO cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant SEKIHYO at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

21. As nearly as presently can be computed, the total amount sought by Plaintiff SAMSUN to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims against Defendant SEKIHYO includes:

(a) Claims for over-payment of hire, for the value of bunkers on board the M/V BENEFIT WISDOM, for over-payment of a monthly fee for communications, victualing and entertainment and for the loss of earnings on the two sub-charters to JH Shipping Co. Ltd. and Dooyang, as set forth in paragraph 13 above, in the total sum of **$ 2,042,351.44**;

(b) An indemnity claim for the claim made by sub-charterer JH Shipping in the sum of **$2,006,814.10**;

(c) An idemnity claim for the claim made by sub-charterer Dooyang in the sum of **$2,305,350.00**;

(d) Interest of **$946,071.60** on the above sums (sub-paragraphs a-c), calculated at the rate of 7.0% per annum, compounded quarterly, for two years, the estimated time it will take to obtain a final arbitration award, which interest is recoverable under

English law; and in Singapore arbitration proceedings under the International

Arbitration Act, Chapter 143A.

(e) Attorneys' fees and costs to be incurred in Singapore arbitration, which Singapore

solicitors estimate to be **$200,000.00**, which fees and costs are recoverable under

English law and in Singapore arbitration under the Supreme court of Judicature

Act, Chapter 322 and the Rules of Court.

22.    Based upon the foregoing, Plaintiff SAMSUN therefore seeks to attach the total

sum of **$7,500,587.14** in this action.

WHEREFORE, Plaintiff SAMSUN LOGIX CORPORATION prays:

A.    That process in due form of law according to the practice of this Court may issue

against Defendant SEKIHYO SHIPPIMG LTD., citing it to appear and answer the foregoing,

failing which a default will be taken against it for the principal amount of the claims of

$6,354,515.54 plus interest, costs and attorney fees;

B.    That if Defendant  cannot be found within the District pursuant to Supplemental

Rule B, that all tangible and intangible property of Defendant, up to and including the claim of

**$7,500,587.14**  be restrained and attached, including but not limited to any cash, funds, credits,

wire transfers, electronic funds transfers, accounts, letters of credit, debts, freights, sub-freights,

charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of

Defendant (collectively "ASSETS"), including but not limited to such "ASSETS" as may be

held, received or transferred in its own name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein served;

C.    That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and

D.    That Plaintiff have such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       November 29, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SAMSUN LOGIX CORPORATION

By:    _____
       William L. Juska, (WJ 0772)
       Daniel J. Fitzgerald (DF 6313)
       80 Pine Street
       New York, NY  10005
       (212) 425-1900
       (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York    )
                   ) ss.:
County of New York  )

WILLIAM L. JUSKA, being duly sworn, deposes and says as follows:

1.      I am an attorney with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications from our clients and documents provided by our clients regarding the claim.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
William L. Juska

Sworn to before me this
29th day of November, 2007

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

595-07/WLJ/DJF
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SAMSUN LOGIX CORPORATION
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

William L. Juska (WJ 0772)
Daniel J, Fitsgerald ( DF 6313)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

SAMSUN LOGIX CORPORATION,                    **07 CV** _____    (    )

                        Plaintiff,

                                             **VERIFIED COMPLAINT**

            -against -

SEKIHYO LINE LTD. ,

                        Defendant.
----------------------------------------------------------x

    Plaintiff SAMSUN LOGIX CORPORATION ("SAMSUN"), by and through its

attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant

SEKIHYO LINE LTD ("SEKIHYO"), alleges upon information and belief as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure. The case also falls within this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. §1333, *et seq.* and / or the Arbitration Act, 9 U.S.C. §1 *et seq.*

and /or §201 *et seq.* and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

    2.    At all times relevant hereto, Plaintiff SAMSUN was and still is a business entity

organized and existing under the laws of Korea with a place of business at 5, 6f, Lee Ma Bldg.,

146-1, Soosong-dong, Chongno-ku, Seoul, Korea.

3.     At all times relevant hereto, Defendant SEKIHYO was and still is a business entity organized under the laws of a foreign country with an office located at 1-1-1 Minami Aoyama, Minato-Ku, Tokyo, Japan, 107-0062 and/or at Shinaoyama Building, Higashi-Kan 1907, Minato-Ku, Tokyo, Japan.

4.     On or about March 16, 2005, Plaintiff SAMSUN, as charterer, and Defendant SEKIHYO, as disponent owner, entered into a maritime contract of charter party on a New York Produce Exchange form for the use and operation of the M/V BENEFIT WISDOM ("the Charter Party").

5.     The Charter Party was to be for a period of "minimum 11 months/maximum 13 months, or in charterers' option, minimum 24 months/maximum 26 months" at a daily hire rate of $14,950 in the case of a charter period of 11/13 months or a daily hire rate of $13,200 in case of a charter period of 24/26 months. A copy of the charter party is attached hereto as Exhibit A.

6.     By Addendum No. 3 dated October 16, 2006, Plaintiff SAMSUN and Defendant Sekihyo extended the term of the charter party by one year at a daily rate of hire of $12,550, with redelivery to occur between the end of April/end of June 2008. A copy of Addendum No. 3 is attached hereto as Exhibit B.

7.     On or about February 14, 2007 Plaintiff SAMSUN entered into maritime contract of charter party whereby it sub-chartered the M/V BENEFIT WISDOM to JH Shipping Co. Ltd. for a period  "min/max 7/9 mos" at a daily hire rate of  $13,700.  The vessel was to remain on charter to JH Shipping Co. Ltd. until September 27, 2007.

8.     Sub-charterer JH Shipping Co. Ltd. further sub-chartered the M/V BENEFIT WISDOM to TKB Shipping of Denmark.

9.    On or about September 5, 2007 Plaintiff SAMSUN entered into a maritime contract of charter party whereby it sub-chartered the M/V BENEFIT WISDOM to Dooyang, at a daily rate of hire of $21,800, the vessel to be delivered into Dooyang's service in October/November 2007, following completion of the sub-charter with JH Shipping Co. Ltd.

10.    Sub-charterer Dooyang further sub-chartered the M/V BENEFIT WISDOM to Chang Sung Shipping.

11.    Pursuant to the terms of the Charter party, Plaintiff SAMSUN performed all of its obligations, including making timely payments of hire. However, on September 10, 2007, in violation of the terms of the Charter Party, Defendant SEKIHYO notified SAMSUN that it was withdrawing the vessel from the charter party. Furthermore, although notice of withdrawal was only given on September 10, 2007, the Master of the M/V BENEFIT WISDOM ceased following the orders of the sub-charterers on September 6, 2007.

12.    As a result of SEKIHYO's breach in wrongfully withdrawing the M/V BENEFIT WISDOM from SAMSUN's service under the charter party dated March 16, 2005, SAMSUN has sustained damages.

13.    SAMSUN, due to SEKIHYO's wrongful conduct, has sustained damages in the sum of $2,288,958.95, as follows:

A. Overpayment of hire to SEKIHYO for 23.208333 days until September 30, 2007 - $291,264.58

B. Loss of the bunkers (fuel) on board the vessel at the time of withdrawal, the value of which SEKIHYO was obligated to reimburse SAMSUN under the terms of the charter party:

Intermediate Fuel Oil - 679.19 metric tons - $272,355.19

Marine Deisel Oil – 56.90 metric tons -        $42,219.80

C.  Overpayment of monthly fee under terms of chartrer party for communications, victualing and entertainment -  $1500 per month x 23.208333 days =  $1,160.42

D.  Loss of earnings on the sub-charter to JH Shipping Co. Ltd. - $81,395.21

E.  Loss of earnings on the sub-charter to Dooyang - $1,600,563.75

Against these losses totaling $2,288,958.95 Defendant SEKIHYO is entitled to credits totaling $246,607.51, leaving SAMSUN with net damages of $2,042,351.44.

14.    In addition, the wrongful withdrawal of the M/V BENEFIT WISDOM by SEKIHYO caused SAMSUN to be unable to fulfill its obligation to provide the vessel to sub-charterer JH Shipping Co. Ltd..  Sub-charterer JH Shipping Co. Ltd. has submitted to SAMSUN claims for damages totaling $2,006,814.10, for which SAMSUN will be liable under the charter party with JH Shipping dated February 14, 2007.  JH Shipping's claims are for overpaid hire and the value of bunkers onboard ($401,059.10), loss of earnings on its sub-charter with TKB Shipping ($290,915.63),  and indemnity claims for TKB Shipping's claims against JH Shipping for loss of earnings ($968,296.87) and a detention charge due to a detention of the vessel at the port of Teesport ($378,000). A copy of JH Shipping's statement of claim is attached as Exhibit C.

15.    Further, the wrongful withdrawal of the M/V BENEFIT WISDOM by SEKIHYO caused SAMSUN to be unable to fulfill its obligation to deliver the vessel to sub-charterer Dooyang, which SAMSUN was obligated to do following completion of its sub-charter contract with JH Shipping Co. Ltd.  Sub-charterer Dooyang has submitted to SAMSUN claims for damages totaling $2,305,350.00, for which SAMSUN will be liable under the charter party with Dooyang dated September 5, 2007. Dooyang's claims are for loss of earnings on its sub-charter

with Chang Sung Shipping ($505,350), and an indemnity claim for Chang Sung Shipping's claim against Dooyang for $1,800,000.00 representing the hire differential between its hire rate under its chartrer with Dooyang ($25,000 per day) and the market rate ($35,000) at the time of the wrongful withdrawal by SEKIHYO. A copy of an e-mail dated October 25, 2007 from Dooyang's chartering broker, J.B. Chartering Corp., sets forth Dooyang's claims and is attached as Exhibit D.

16.    Plaintiff SAMSUN has demanded payment from SEKIHYO for the aforementioned outstanding claims. Despite having made due demand, however, Defendant SEKIHYO, in breach of the Charter Party with SAMSUN, refused or otherwise failed to pay. A copy of SAMSUN's Claim Invoice in the amount of $6,354,525.54, which has been submitted to SEKIHYO, is attached as Exhibit E.

17.    The Charter Party dated March 16, 2005 between SAMSUN and SEKIHYO provides that it is to be governed by English law and that all disputes between the parties are to be resolved by arbitration in Singapore. Plaintiff SAMSUN expressly reserves herein its right to arbitrate the merits of its claims against SEKIHYO in accordance with the agreement of the parties.

18.    This action is brought to obtain jurisdiction over the Defendant SEKIHYO and to obtain security in favor of Plaintiff SAMSUN in respect to its claims against SEKIHYO and in aid of Singapore arbitration proceedings.

19.    This action is further brought to obtain security for any additional sums to cover Plaintiff SAMSUN's anticipated costs in the arbitration and interest, all of which are recoverable under English law and the statutes and rules applicable to Singapore arbitration.

20.    Upon information and belief, and after investigation, Defendant SEKIHYO cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant SEKIHYO at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

21.    As nearly as presently can be computed, the total amount sought by Plaintiff SAMSUN to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims against Defendant SEKIHYO includes:

(a) Claims for over-payment of hire, for the value of bunkers on board the M/V BENEFIT WISDOM, for over-payment of a monthly fee for communications, victualing and entertainment and for the loss of earnings on the two sub-charters to JH Shipping Co. Ltd. and Dooyang, as set forth in paragraph 13 above, in the total sum of **$ 2,042,351.44**;

(b) An indemnity claim for the claim made by sub-charterer JH Shipping in the sum of **$2,006,814.10**;

(c) An idemnity claim for the claim made by sub-charterer Dooyang in the sum of **$2,305,350.00**;

(d) Interest of **$946,071.60** on the above sums (sub-paragraphs a-c), calculated at the rate of 7.0% per annum, compounded quarterly, for two years, the estimated time it will take to obtain a final arbitration award, which interest is recoverable under

English law; and in Singapore arbitration proceedings under the International

Arbitration Act, Chapter 143A.

(e) Attorneys' fees and costs to be incurred in Singapore arbitration, which Singapore

solicitors estimate to be **$200,000.00**, which fees and costs are recoverable under

English law and in Singapore arbitration under the Supreme court of Judicature

Act, Chapter 322 and the Rules of Court.

22.    Based upon the foregoing, Plaintiff SAMSUN therefore seeks to attach the total

sum of **$7,500,587.14** in this action.

WHEREFORE, Plaintiff SAMSUN LOGIX CORPORATION prays:

A.    That process in due form of law according to the practice of this Court may issue

against Defendant SEKIHYO SHIPPIMG LTD., citing it to appear and answer the foregoing,

failing which a default will be taken against it for the principal amount of the claims of

$6,354,515.54 plus interest, costs and attorney fees;

B.    That if Defendant cannot be found within the District pursuant to Supplemental

Rule B, that all tangible and intangible property of Defendant, up to and including the claim of

**$7,500,587.14** be restrained and attached, including but not limited to any cash, funds, credits,

wire transfers, electronic funds transfers, accounts, letters of credit, debts, freights, sub-freights,

charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of

Defendant (collectively "ASSETS"), including but not limited to such "ASSETS" as may be

held, received or transferred in its own name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein served;

C.    That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and

D.    That Plaintiff have such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
        November 29, 2007

                            FREEHILL HOGAN & MAHAR, LLP
                            Attorneys for Plaintiff
                            SAMSUN LOGIX CORPORATION


            By:     _____
                            William L. Juska, (WJ 0772)
                            Daniel J. Fitzgerald (DF 6313)
                            80 Pine Street
                            New York, NY  10005
                            (212) 425-1900
                            (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York     )
                      ) ss.:
County of New York  )

WILLIAM L. JUSKA, being duly sworn, deposes and says as follows:

1.      I am an attorney with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications from our clients and documents provided by our clients regarding the claim.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
William L. Juska

Sworn to before me this
29th day of November, 2007

Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931 ; October 3rd, 1946




DUPLICATE

1 *This Time Charter Party*, made and concluded in .... *Tokyo, Japan* ................ *16th* ... day of .... *March*, ...... 20 *05*
2 ~~Between~~ *SEKIHYO LINE LTD.*
3 Owners of the good *Panamanian* ..... ~~steamship~~/Motorship ... *"BENEFIT WISDOM" (See Clause 71)* .............. of *built in 1985*
4 of ..... .............. tons gross register, and ................ tons net register, having engines of ................ indicated hose power
5 and which hull, machinery and equipment in a thoroughly efficient state, and classed ............................................. ...
6 at ................ of about ................ cubic feet bale capacity, and about .. *23,542 metric* .... ...... tons of *2240 lbs.*
7 deadweight capacity (cargo and bunkers, including fresh water and stores ~~not-exceeding one and one half percent of ship's deadweight capacity,~~
  *lubricating oil and spare parts*
8 ~~allowing a minium of fifty tons)~~ on a draft ...... .... Feet ......... Inches on .............. Summer freeboard, inclusive of permanent bunkers,
9 which are of the capacity of about ..................................... tons of fuel, and capable of steaming, fully laden, under good weather
10 conditions about . *12.0* . knots on a consumption of about .. *18 MT  I.F.O. ( 180CST)* , ~~tons of best Welch coal best grade fuel oil best grade Diesel oil,~~
11 now *trading* ..........................................................................................................
12 .. .............. and *SAMSUN LOGIX CORPORATION* ............... as Charterers of the City of *Seoul* ....................
13 ___ *Witnesseth,* that the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 ~~about~~ *minimum 11 months/maximum 13 months,  or in Charterers' option, minimum 24 months/maximum 26 months. The option to be declared*
15 *by Charterers, latest by the day of vessel's delivery* ................................... within below mentioned trading limits.
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remining responsible for
17 the fulfillment of this Charter Party, *Acceptance of delivery shall not constitute any waiver of Owners' obligations hereunder.*
18 Vessel to be placed at the disposal of Charterers, at *on dropping last outward sea pilot at one safe port, Taiwan, Hong Kong or Guangzhou, port*
   *in Owners' option at any time day/night, Saturday, Sunday, Holiday included with Lay/Can 10/30 April, 2005, or on dropping last outward*
19 *seapilot at one safe portin Singapore /Japan range including South Korea and P.R.C.,  port in Owners' option at any time day/night,*
   *Sunday, Saturday and Holiday included, with Lay/Can 10 May / 15 June, 2005*
20 ~~in such deck  or at  such wharf or place (where she may safely lie, always afloat, at all times of tide, except  as otherwise provided  in clause No.6), as~~
21 ~~the Charterers  may  direct.  If such dock,  wharf or place be not available time to count as provided  for in  clause No.5,  Vessel  on her delivery  to be~~
22 ready to receive cargo with clean swept holds *(see Cl.32)* and tight, staunch,. Strong and in every way fitted for the *any permissible cargo* service,
   having water Ballast, *cranes* winch and
23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, the other power sufficient to run  all the *cranes* winches at one and
24 the same time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful
25 merchandise, ~~including petroleum or its products, in proper containers,~~ excluding  *in such lawful trades between safe port and/or ports.*
26 ~~(vessel  is not to be  employed in the carriage of Live Stock, but  Charterers  are to have  the privilege of shipping a small number on deck at their risk,~~
27 ~~all necessary fittings and other requirements  to be for account of Charterers), in such lawful trades,  between safe port and/or  ports in British North~~
28 ~~America, and/or  United States of America,  and/or  West Indies,  and/or  Central America,  and/or  Caribbean Sea,  and/or  Gulf of Mexico,  and/or~~
29 ~~Mexico,  and/or  South America~~ ............................................................................ ~~and/or  Europe~~
30 ~~and/or  Africa,  and/or  Asia,  and/or  Australia,  and/or  Tasmania,  and/or  New Zealand,  but excluding Magdalena River, River St. Lawrence between~~
31 ~~October  31st  and  May  15th,  Hudson  Bay  and  all  unsafe  ports;  also  excluding,  when  out  of  season,  white  Sea, Black Sea  and  the Baltic,~~
32 *See Clause 29* ..................................................................................... .. .... .
33 ........................................................................................................
34 ........................................................................................................
35 as the Charterers or their Agents shall direct, on the following conditions:
36     1.     That *whilst vessel on-hire* the Owners shall provide and pay for all provisions, wages and *immigration* consular shipping and discharging fees
       of the crew; *also consular fees pertaining to vessel's nationality or flag and all garbage removal except hold cleaning,* shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boilerwater *freesh water for domestic*
   *consumption and lubricating oil* and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, machinery, *holds and cargo spaces and equipment with all certificates necessary to*
   *comply with the current requirements at ports of call and canals for and during the service, failing which Owners are responsible*
   *for all time lost and expenses incurred thereby* for and during the service.
39     2.     That *whilst vessel on-hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed,Port Charges.Pilotages. *compulsory*
   *and customary pilotages, boatage on Charterers' business, tug–assistance* Agencies. Commission.
40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the  vessel  puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered  because  of
4. illness of the crew to be for Owners account. Fumigation ordered because of cargoes carried  or  ports visited  while vessel employed  under  this
43 charter to be for Charterers account.  ~~All other fumigations  to be for Charterers account  after  vessel has been  on charter for a continuous period~~
44 ~~of six months or more.~~
45 Charterers are to provide necessary *lashing/securing materials, slings* dunnage and shifting boards, also any fittings requisite  for a special
   trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. ~~Charterers to have the privilege of using  shifting by~~


EXHIBIT
A
tabbies.

~~for dunnage, they making good any damage thereto.~~

46    3.    That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49    board the vessel *as per Clause 55* ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~ , , , , , , , tons and

50    ~~not more than~~ , , , , , , , , tons and to be re-delivered with not less than , , , , , , , , , , , , , , , tons and not more than , , , , , , , , , , , tons

51    4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of . . . . . . . . . . . . . . . . . *as arranged* . . . . . . . . . . . . . . . . .

52    . . . . . . . . . . . United States Currency per *day prorata including overtime* - ton on vessel's total deadweight carrying capacity, including bunkers and

53    ~~stores, on~~ . . . . . . . . . . . . . . . . *summer broeboard, per Calendar Month,* commencing on and from the day of her delivery, as aforesaid, and at

54    and after the same rate for any part of a *day month;*  hire to continue until the hour of the day of her re-delivery in like good order and condition,

      *fair wear and tear excepted  ordinary*                         Hire to be computed in G.M.T.

55    ~~wear and tear excepted,~~ to the Owners (unless lost) ~~at~~ on dropping last outward sea pilot at world wide within the trading limits (See Cl.29), *port*

56    *In Charterers' option, any time  day / night, Sunday, Holiday included* unless otherwise mutually agreed. Charterers are to give Owners

      not less than  *20/15/10/8* . . . . . . before . . . one . . . . . 8/6/4/3/2/1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . days *approximate*

57    notice of vessels expected date of re-delivery, and probable port.

58    5.    Payment of said hire to be made *by T.T. remittance to the Owners' nominated bank in Tokyo* ~~in New York~~ In cash in United Sates

      Currency,  semi-monthly in advance, and for the last half month or

59    part of same the approximate amount of hire, ~~and  should same not cover the actual time,  hire is to be paid for the balance day by day, as it becomes~~

60    ~~due, if so required by Owners,  unless bank guarantee or deposit is made by the Charterers,~~ otherwise  failing the punctual and regular payment of the

61    hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers,

62    without prejudice to any claim they  (the Owners) may otherwise have on the Charterers.  *Charterers have the privilege to deduct  from last*

      *sufficient hire payment (s)  ( or  any other payments due to Owners where  the  last  hire  payments  are  insufficient  to  cover  same)*

      *estimated  value  of  bunkers  remaining  on board on redelivery and Owners' disbursements (See also Clause 46)* ~~Time to count from 7 a.m.~~

      ~~on the working day,~~

63    ~~following  that  on  which  written notice of readiness has been given to  Charterers  or  their Agents before 4 p.m. but if required  by Charterers,  they~~

64    ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65    Cash for vessel's ordinary  disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents,  subject

66    to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67    of such advances.

68    6.    That the cargo  or cargoes be laden and / or  discharged  in any dock  or  at any wharf or place that Charterers  or  their Agents  may

69    direct, provided the vessel can safely lie always afloat at any time of tide, except at such places  *Buenaventura, River Plate and Amazon River only*

70    where is customary for similar size vessels to safely lie aground.

71    7.    That the whole reach of the Vessel's Hold, Decks,  and usual places of  loading  (not more than she can reasonably stow and carry),  also

72    accommodations for Supercargo,  if carried,  shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's  officers,  crew,

73    tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers  have  the  privilege  of  passengers  as  far  as  accommodations  allows,  Charterers~~

74    ~~paying Owners~~ , , , , , , , , ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75    ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76    8.    That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ship's crew and

77    boats.  The Captain  (although appointed by the Owners),  shall be under the orders and directions of the  Charterers as regards  employments and

78    agency, and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their expense under the supervision of the Captain, who is

      to sign Bills of Lading for

79    Cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *(See Clause 70)*

80    9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81    receiving particulars of the complaint, investigate the same, and if necessary, make a change in the appointments.  *But this provision does not affect*

      *Charterers'  right to advance any claim  or  require Arbitration under Clause 17 on  dispute  regarding  the  conduct  of  the  Master*

      *In prosecution of the voyage and in carrying out the orders and directions of the Charterers.*

82    10.    That the Charterers shall  have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83    with the utmost despatch. He is to be furnished with free accommodation,  and same fare as provided for Captain's table, Charterers  paying  at  the

84    rate of  *US$9.00 per day.* Owners  to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85    Clerks, Stevedore's Foreman, etc.. ~~Charterers paying at the current rate per meal, for all such victualling~~ *(See Cl.49)*

86    11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and  sailing directions,  in writing, and the

87    Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agent, and furnish the Charterers

88    *or  their agents or Supercargo.* when required, with  true copy of daily logs in *English,*  showing the course of the vessel and distance run and the

89    consumption of fuel.

90    12.    That the Captain shall use diligence in caring for the ventilation of the cargo.

91    13.    ~~That the Charterers shall have the option of continuing this charter for a further period of~~ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

92    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

93    ~~on giving written notice thereof to the Owners or their Agents~~ , , , , , , ~~days previous to the expiration of the first-named term, or any do-clared option.~~

94    14.    That if required by Charterers, time not to commence before . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . and should vessel not have

95    given written notice of readiness on or before . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~but not  later  than  4 p.m.~~ Charterers  or

96    their Agents to have the option  of cancelling this Charter at any time  not later than the day of vessel's readiness.    *Owners to give Charterers*

      *30/15 days approximate delivery notice with probable port and 10/7/5/3/1 days definite delivery notice with port.*

      *Lay/Can shall be  10 April / 30 April, 2005  or  10 May / 15 June, 2005  which to be declared later on.*

97    15.    That in the event of the loss of time from *default and/or* deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment,

98    grounding.  detention  by  average accidents to ship or cargo, drydocking  for purpose  of  examination  or  painting  bottom,  or  by  any  other  cause

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost: *until the vessel returns to the same or*
   *equivalent position* and if upon the voyage the speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra expenses shall be deducted from the hire. *duly supported by vouchers*
102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The Act of the God, enemies, fire, restraint of Prices, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.
107  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *arbitrators* three persons at
   ~~New York,~~ *Singapore in English Law*
108  one to be appointed by each of the parties hereto, and the third by the two so chosen: decision or that of any two of them, shall be final, and for
109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.
110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average
111  contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents,
113  which might have priority over the title and interest of the owners in the vessel.
114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled *in Singapore in English Law*, according to Rules 1 to 15, inclusive 17 to 22
   ~~inclusive , and Rule F of~~
116  York-Antwerp Rule *1994 or any amendment thereto* ~~1924, at such port or place in the United States as may be selected by the carrier,~~ and
   as to matters not provided for by these
117  Rules, according to the laws and usages at the port of ~~New York~~ *Singapore in English Law*. In such adjustment disbursements in foreign
   currencies shall be exchanged into
118  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement
120  or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option o f the
123  carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124  place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125  United States money.
126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, or which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130  ~~goods. If an salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers.~~
132  Provision as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133  20. Fuel used by the vessel while off hire, also for ~~cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.
135  ~~21. That as the vessel may be from time to time employed in tropical waters during the terms of this Charter, Vessel is to be docked at a~~
136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service, - (See Cl.66)~~
138  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
139  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
140  22. Owners shall maintain the gear of the ship as fitted, providing gear ( for all *cranes* derricks) capable of handling lifts *as per Cl. 71* ~~upto three~~
   ~~tons, also~~
141  providing ropes, falls, slings and blocks *as on board*. If vessel is ~~fitted with derricks capable of handling~~ heavier lifts. ~~Owners are to provide necessary~~
142  ~~gear for same, otherwise~~ equipment and gear for heavier lifts shall be for Charterers' account. Owners also provide on the vessel *lights as on board*
   ~~lanterns and oil for~~
143  night work, and vessel to give use of electric light when so fitted, but additional lights over those on board to be at Charterers' expense. The
144  Charterers to have the use of any gear on board the vessel.
145  23. Vessel to work night and day, if required by Charterers, and all *cranes* winches to be at Charterers' disposal during loading and discharging;
146  ~~steamer to provide on winchman per hatch, to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147  ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148  ~~port, or labor unions, prevent crew from driving winches,~~ shore *crane driver* Winchmen to be *employed and* paid by Charterers. In the event
   of a disabled *crane* winch or *cranes* winches, of
149  in sufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  thereby.
151  24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled 'An Act relating to Navigation of Vessels;
153  etc', in respect of all cargo shipped under this charter to or from the United States of America. ~~It is further subject to the following clauses, both~~
154  ~~of which are to be included in all bills of lading issued hereunder.~~

~~U.S.A. Clause Paramount~~

155

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 ~~Both to Blame Collision Clause~~

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non~~

165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging.

170 26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the

171 navigation or the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

172 27.  A commission of 1.25 percent is payable by the Vessel and Owners to

173 *SEO KANG SHIPPING CO., LTD.. . . . . . . . . . . . . . . . . . . . . . .*

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28.  An address commission of 2 1/2 per cent payable to *Charterers . . . . . . . . . . . . . . . . . . . . . . . .* on the hire earned and paid under this Charter.

*Clauses 29 to 78 inclusive as attached, to be considered fully incorporated in this Charter Party.*

Owners :                                     Charterers :

SEKIHYO LINE LTD.

Manager

For and on behalf of
SAMSUN LOGIX CORPORATION.

*Authorized signature*



Rider to Charter Party dated Tokyo, 16th March, 2005 – M.S. "BENEFIT WISDOM"

29. Trading Limit
Vessel to always trade within I.W.L., Charterers have option to breach of I.W.L. subject to Owners' underwriters approval and invoice, always afloat at any time of tide, Charterers' option NAABSA, always via safe port(s)/berth(s) excluding Israel, Cuba, North Korea, Yemen, Cambodia, Great Lakes, Lebanon, Syria, places subject to U.N.sanctions, areas prohibited by vessel's war risks underwriters due to war or war-like activities, and places which may be excluded by the authority of vessel's flag..

Charterers have option to trade vessel to C.I.S. Russian Far East on the following conditions : –

1) Charterers to arrange for phytosanitary inspection to be carried out and phytosanitary certificate valid for all countries issued by official inspectors to be placed on board the vessel at Charterers time and expense prior to vessel's sailing from C.I.S. Russian Far East port.

2) Breach of I.W.L. to be for Charterers account and the additional premium for such breach to be paid by Charterers in advance prior to such breach upon Owners faxing their underwriters/brokers' invoice.

3) Vessel not to be ordered to ice-bound ports/areas.

Vessel is not to trade direct between People's Republic China and Taiwan.

30. Stevedore Damage
Stevedore to be appointed and paid by the Charterers but to work under supervision of the Master. Should any damage be caused to the Vessel or her fittings by the stevedores, the Master has to try to let the stevedores repair such damage and try to settle the matter directly with them.

The Charterers shall not be responsible for any damage caused by stevedores to the Vessel unless the Master obtains written acknowledgment of the damage and liability or written receipt of Master's damage notice from the concerned stevedores and immediately notifies the Charterers or their agents of such damage with details within 24 hours from the occurrence except in case of hidden damage which to be notified as soon as discovered prior to completion of the particular voyage.

The Charterers shall have the liberty to redeliver the vessel without repairing the damage for which the Charterers are responsible, as long as the same do not affect the vessel's seaworthiness, but the Charterers undertake to reimburse costs of repair against the production of repair bills by repairers or dockyard unless otherwise agreed.

31. Joint On/Off Hire Survey
On/off hire survey to be held jointly at the delivery/redelivery ports to ascertain vessel's condition and quantity of bunkers remaining on board by Owners and Charterers.
The cost to be equally shared but in Owners' time on delivery and in Charterers time on redelivery.

32. Hold Condition on Delivery and Redelivery
The vessel's holds on arrival at first loading port to be water washed, dried up and completely clean through and in all respects ready to receive Charterers' intended cargo and pass Shippers'



inspection, failing which vessel to be off-hire until passing the reinspection and Owners to pay all expenses incurred resulting from such failure.

The vessel shall be redelivered by the Charterers to the Owners with clean swept holds. However the Charterers shall have the option to redeliver the Vessel with holds as are discharged and left by stevedores, in consideration of which the Charterers shall pay a lump sum compensation of US$3,500.00 to the Owners including removal/disposal of barks/dunnage or residue from Charterers' last cargo.

33. Equipment
The Vessel shall be in possession of International Cargo Gear Certificate showing that all gears in order which to be shown to Charterers or their agents, if required by them.

34. Deviation/Put Back
In the event of loss of time either in port or at sea, deviation from the course of the voyage or putting back whilst on voyage caused by sickness of or an accident to the Master/Officers/Crew, or caused by stowaway, refugee or any person on board the Vessel other than persons travelling by request of Charterers by the act or neglect of Charterers, or by reasons of refusal of Master or Officers or Crew to perform their duties or of an accident or breakdown to vessel or dry-docking or periodical survey, or salvage or any alleged pollution damage, hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until the Vessel is again efficient in the same or equivalent position where the vessel is originally destined for and voyage resumed therefrom, and all expenses incurred including bunkers consumed during such period of suspension shall be for Owners' account.

35. Grab Discharge
The Vessel is properly reinforced tank top for grab discharge.

36. Quarantine/Radio Pratique
Normal quarantine time and expenses for the Vessel's entering port shall be for the Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness and etc., of Master, Officers and Crew shall be for the Owners' account. Further the Vessel shall prepare radio pratique at port or ports where radio pratique available.

37. Deratting Certificate
The Vessel shall be delivered with valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of this Charter, cost of renewal of certificate and fumigation if necessary shall be for the Owners' account. Any detention and extra expenses incurred thereby shall be also for the Owners' account.

38. New Jason Clause, New Both-to-Blame Collision Clause, War Clause, etc.
New Jason Clauses, New Both-to-Blame Collision Clause, Baltime 1939 War Clause, Chamber of Shipping Clause Paramount, as attached, to be considered fully incorporated in this Charter Party and to be included, as appropriate, in Bills of Lading issued under this Charter Party. U.S.A. Clause Paramount and Canadian Clause Paramount, as also attached, to be considered fully incorporated in this Charter Party and to be included, as appropriate, in Bills of Lading issued under this Charter Party in respect of all cargo shipped under this charter to or from the U.S.A. and the Canada respectively.

39. Cargo Gear
The Vessel can work all gear simultaneously. With reference to Clause 15 and 23, in the event of break--down of cranes/derricks by reason of disablement or insufficient power, the hire is to be reduced pro-rata



for period of such inefficiency in relation to the number of cranes/derricks available. The Owners to pay in addition to the cost of labour affected by breakdown either waiting for resumption of work or additionally engaged . This does not exempt the Owners from liability for cost of hiring shore appliance, but hire shall not be reduced if shore appliances are substituted, on the Owners' account, for cranes that are out of action due to the reason stated above

Charterers have the option to conduct survey/test on vessel's gears anytime during the currency of this time charter period. If found to be not in full working capacity, Owners to immediately rectify the problems and all cost/time loss to be for Owners' account.

40. Return Premium
The Charterers to have the benefit of any return of insurance premium receivable by the Owners from Underwriters (as and when received from the Underwriters) by reason of the Vessel being in port for a minimum of 30 days, provided the Vessel is on-hire.

41. War Risk Insurance
Basic war risk insurance premium for worldwide trading shall be for the Owners' account and additional premiums for hull and machinery and the Officers/Crew as well as crew war bonus due to the Vessel's trading to the restricted area shall be for the Charterers' account.

Underwriters    :    Chung Kou Insurance Co., Ltd.
Insured value for Hull and Machinery   :       U.S.$10,000,000.00

42. War Cancellation
If major war breaks out between any two or more of the following countries : United Kingdom, U.S.A., Russia, People's Republic of China, Japan, dirctly affecting the performance of this Charter, both the Owners and the Charterers shall have the option of canceling this Charter. Whereupon the Charterers shall redeliver the Vessel to the Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by the Charterers. In all cases hire shall be paid until the Vessel's redelivery.

43. Watchmen
Watchmen for cargo to be for the Charterers account. Ordinary watchmen for ship's crew property/ protection etc., to be for the Owners' account. But gangway watchmen, if required by the port authorities, which to be equally shared by the Charterers and the Owners.

44. Itinerary of Vessel
The Charterers undertake to keep the Owners informed during Charter Party period as regard as itinerary of the Vessel and names of agents at port of call.

45. Cash Advance
The Charterers shall not be obliged to advance cash to the Master unless mutually agreed, and the same to be deducted from hire in advance.

46. Owners' Agents
The Owners to appoint their own agents for repairs, average and also for any other Owners' business when requested by the Charterers. The Owners are always entitled to avail themselves, without agency



fee to the Owners, of the Charterers' agents for crew mail and similar normal minor Vessel's items as far as agents can manage.

47. Taxes/Dues/Charges
Any Taxes and/or dues and/or charges whatsoever, imposed on cargo and/or freight by any local or national authorities, arising out of the trade under this Charter Party, to be born by the Charterers.

48. Charterers' Colours and Flag
The Charterers have the liberty of flying their own house flag and painting the funnel to their own colours. Time and expenses for painting the funnel initially or any time during the currency of the Charter shall be for the Charterers' account. The funnel shall be repainted to the Owners' colours prior to redelivery in the Charterers' time and expenses.

49. Lump Sum Amount for Cable/Victualling
The Charterers to pay the Owners lumpsum U.S.$1,500.00 monthly or pro rata in lieu of communication fee, such as telephone, radiograms, telexes, victualling and entertainment for the Charterers' business. Lumpsum U.S.$500.00 per voyage for crew's hatch operation and lumpsum U.S.$ 2,000.00 for crew's intermediate hold cleaning including removal/disposal of dunnages to be paid to Owners by Charterers together with hire.
This lumpsum amount shall be reviewed and revised on the basis of Owners' actual figures on preceding year.

This Payment shall simultaneously be made with hire payment.

50. P. and I. Club
The Owners guarantee that the Vessel shall be fully covered by The Standard.
The Charterers have the benefit of the Owners cover granted by the P. & I. Club as far as the rules permits.

51. Master & Crew
The Owners undertake to do their utmost to obtain good Master, Officers and Crew.
Master must perform the self pilotage as much as possible at Japanese ports and master's self pilotage bonus to be negotiated directly with master.

52. When Manoeuvering
The Vessel uses diesel oil for main engine when manoeuvering in narrow water, canals, rivers, in and out of port.

53. Fouling Bottom
In the event of the Charterers ordering the vessel to port(s) where vessel's stay is more than 15 consecutive days or to lay-up so as to cause bottom fouling. Charterers to clean vessel at their time and expense, otherwise Owners' representation of vessel's vessel's speed/consumption to be non operative from time of sailing such port(s) until vessel's next dry dock, such fouling affecting speed to be evidenced through a joint divers' inspection. Cost for same to be for Owners' account and time to be for Charterers' account.

54. Panama/Suez Canal Transit
During full currency of this Charter Party, the Owners shall keep the Vessel fully capable and equipped to transit the Panama Canal and Suez Canal in accordance with the Rules and Regulations governing navigation of the canals mentioned herein promulgated from time to time by the local authorities.



55. Bunkers on Delivery/Redelivery

The Vessel to be delivered with bunkers on board (IFO about xxx tons and MDO about xx tons) and to be redelivered with bunkers about same quantities as on delivery.
The Charterers to have the liberty to bunker the Vessel prior to delivery for their own account provided this does not interfere with Owners work. The Owners are allowed to replenish bunkers before redelivery at the Owners' expenses and time subject to the Charterers' prior approval which shall be not be unreasonably withheld.

Bunker Prices shall be U.S.$230.00 per metric ton for Fuel Oil (180 CST) and U.S.$430.00 per metric ton for Diesel Oil.

The Charterers to pay the value of the bunkers on board on delivery with first hire payment and have the right to deduct the estimated value of the bunkers on redelivery from the last sufficient hire payment.

56. Oil Pollution

(a) If the Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawful to enter, remain in on leave any port, place, territorial or contiguous waters or exclusive economic zone of any country or state in performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise may be necessitated to satisfy such requirements at Owners' sole expense.

(b) The Charterers shall be under no responsibility for all consequences (including loss of time) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for the above and any loss of time incurred thereby shall be off-hire, unless the same shall be due to the default of Charterers.

( c ) The Owners shall indemnify and hold the Charterers harmless against all consequence (including fines if any imposed to the Charterers) of oil or other pollution damage unless due to Charterers and any failure or inability of the Owners to do so as provided for in the preceding paragraph(a).

In connection with the preceding paragraph(a) , a particular reference is made to a certificate of Financial Responsibility in compliance with requirements of the U.S. Federal Water Pollution Act as amended, the Oil Pollution Act of 1990, the Comprehensive Environmental Response Compensa- tion and Liability Act as amended, and any amendment thereto.

(d) The Owners warrant that the vessel is entered with the protection and indemnity insurer listed in Charter Party for the full coverage available for marine pollution risks. In the event the Owners fail to undertake such measures, the Charterers may, at their option, upon notice to the Owners or the Master, do so themselves and any measures taken by the Charterers shall be deemed taken on the Owners' authority and as the Owners' agents, and shall be at Owners' expenses except to the extent that any such pollution damage or threat was caused or contributed to the Charterers. The Owners to be responsible for and to comply with local regulations.

COFR Number :

57. Preparation for Loading and Discharging

The Vessel's officers and crew shall perform shaping up of the Vessel's hatches and gangway prior to and upon arrival at port in order to commence loading and/or discharging operation without delay. Opening and closing of all hatch covers shall be performed by the officers and crew in addition to usual



operations performed by them with free costs to the Charterers and unless prohibited by port regulations.

58. Boycott

Hire shall not be due for any time lost by reason of any boycott or any blacklisting or any threat to boycott or blacklist the Vessel on any account of her flag, nationality or her registry, her ownership or management, the nationality of any member of her crew or the terms on which the crew are engaged and the Owners shall remain responsible for all consequential costs that may be incurred by the Charterers.

59. ITF

The Owners guarantee that the minimum terms and conditions on employment of the crew of the Vessel are now or will be prior to the delivery of the Vessel into this charter, covered by a BONA FIDE TRADE UNION AGREEMENT acceptable to ITF and their local affiliates. If the Vessel does not meet these requirements at any time during the currency of the Charter, the Vessel is to go off-hire for the time lost thereby until such requirements are fully complied with and any costs involved, including shore labour stand-by time, to be for Owners' account.

60. Grace Period

Referring the lines 60 and 61, where there is failure to make "punctual and regular payment" of hire the Charterers shall be given by Owners two(2) banking working days written notice to rectify the failure, and when so rectified within those two(2) days following Owners' notice, the payment shall stand a regular and punctual and the Owners will not withdraw the Vessel.

61. Arrest

Should the Vessel be arrested during the currency of this Charter Party, at the suit of any person having or purporting to have a claim against or any interest in the Vessel, not arising from this Charter Party, hire under this Charter Party shall not be payable in respect of any period whilst the Vessel remains under arrest or remains unemployed as the result of such arrest, and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter Party in respect of any period during which by virtue of the operation under this clause, no hire is payable. This clause is inoperable should the arrest be caused by the act or omission default of the Charterers or their agents.

62. Blacklist

The Owners guarantee that the Vessel is not Arab blacklisted and is not blacklisted by any of vessel's calling ports and countries under this charter.

63. Breaking I.W.L.

The Charterers have the right to break Institute Warranties Limits, subject to the Owners hull under-writers' prior approval, with the Charterers giving due notice well in advance to the Owners for that purpose.

The Charterers to reimburse extra insurance incurred thereby and but as per Lloyd's equivalent amount are entitled to have the benefit of any discounts received by the Owners for such extra insurance.

64. Steel Coils

The Owners guarantee the Vessel can load steel coils in all holds provided loaded, stowed, lashed and secured with wooden battens places on tank tops, all to be in accordance with Master's and/or Lloyd's Surveyors requirements and not exceeding respective tank top strength



65. Inter-Club NYPE Agreement

Notwithstanding anything contained herein to the contrary, it is expressly agreed that all cargo claims will be apportioned in accordance with the Inter-Club New York Produce Exchange Agreement (as amended May, 1984).

66. Drydocking

The Owners have the right of temporarily withdrawing the vessel, subject to mutual agreement between the Owners and the Charterers for time and place, from the Charterers service to execute maintenance, repairs, bottom cleaning, painting and/or survey including drydocking. The Owners to notify the Charterers, except in case of emergency, of their intention with 2 months prior notice and obtain the Charterers' consent for time and place which is not to be unreasonably withheld.

67. Cargo Exclusions

It is understood that the vessel is not to be employed in the carriage of cement in bulk, raw cotton, livestock, injurious, inflammable or dangerous goods (such as acids, explosives, arms, ammunition or warlike materials, nuclear or radioactive products or wastes or chemical products), calcium carbide, ferro-silicon, naphtha, motor spirit, tar or any of their products, ammonium nitrate (see below), direct reduced iron pellets, hide, petroleum or it's products (but petroleum coke allowed), pitch in bulk, scrap, motor blocks and turnings. Charterers are not allowed to load Indonesian round logs, unless Indonesian government declares the export "re-open" and Charterers hold valid export license.

Log's shipment only three(3) voyages maximum in a year, especially the Indian round logs ex Sarawak, PNG and Solomon are not allowed.

Cargo listed in the IMDG Code should be subject to Owners' prior approval and to be loaded strictly in accordance with IMO and local rules and regulations.

Concentrates are permitted provided always loaded in line with IMO/local regulations.

Ammonium nitrate of Fertilizer grade to be allowed.

Charterers to have the option to carry Three(3) voyages in total out of salt and/or sulphur and/or petroleum coke during each year(12 months) but sulphur or salt or petroleum coke not to be carried as last cargo under this time charter.

If vessel carrying petroleum coke on the intermediate voyage of this Charter then Charterers to responsible the vessel with holds cleaned up to grain holds standard and no hold cleaning compensation falls due to Owners.

A) Prior to loading of salt or sulphur :
   Depending on the standard of hold coatings partially lime wash the holds (this is done generally upto a level equal to the top of the lower wing tanks).

B) After discharging of salt or sulphur :
   Sweep and wash down hold. Rinse and flush bilges and bilge lines with fresh water.

C) In case crew are requested to do above works by Charterers, crew will render utmost assistance provided weather and time between last discharge port and next loading port allows, as far as possible, without responsibility of the result, Charterers paying a bonus direct to crew for each operation for applying and removing apart from hold cleaning bonus as Master and Charterers mutually agreed, but arrangement/time/expense including cost of material are always for Charterers' account.



In case bagged rice is carried, Owners are not responsible for all bags torn/shortlanded/damaged/leakage/pilferage except for ones wetted or other damage caused by vessel's unseaworthiness.

68. The Charterers are to have the option of loading lawful cargo on deck at their risk and expenses within the visibility/stability, trim and deck strength but always subject to the Master's satisfaction.

69. Lightening
If so required by the Charterers, the Vessel may be ordered to load or discharge into a seagoing vessel alongside at a recognized safe lightening place inside or off a port. The Charterers to provide adequate fenders and lines for the operation and to pay all extra expenses involved, including any/all extra insurance. The whole operation to be to the Master's satisfaction with regard to the safety of the Vessel.

Delivery over side into the other vessel in the case of discharging to constitute right and true delivery under the relative Bills of Lading for that voyage. All stevedoring and tallying to be performed by the Charterers. The Charterers to give the Owners 96 hours where possible, otherwise as soon as possible, clear notice of their intention to perform such operation, advising approximate type and quantity of cargo involved, the other vessel concerned, ultimate destination of cargo and location of operation.

70. Bill(s) of Lading
Notwithstanding the provisions of clause 8, the Charterers and/or their Agents are hereby authorized to sign on Master and/or the Owners' behalf Bills of Lading as presented strictly in accordance with Mate's or Tally Clerks receipt without prejudice to this Charter Party but the Charterers to be respon-sible for all consequence that might result from the Charterers and their Agents signing Bills of Lading not adhering to the remarks in the Mate's or Tally Clerks receipt.

Charterers' Bills of Lading to be used.
The Charterers and/or their agents may alternatively issue and sign Sea Waybills in lieu of Bills of Lading for those shippers with whom Charterers have the contracts allowing or requiring Sea Waybills to be used. Such Sea Waybills must however include all terms, conditions, exceptions against liability that are contained in Charterers' usual form of Bill of Lading, Charterers shall further indemnify and hold Owners harmless from all consequences arising out of the issuance of Sea Waybills in lieu of Bills of Lading.

Should original Bill(s) of Lading not arrive at discharging port(s) in time then the Charterers may request the Owners to release entire cargo without presentation of original Bill(s) of Lading, and the Charterers hereby state that they shall indemnify the Owners against all consequences arising from the Owners conforming to the Charterers' request in releasing cargo without original Bill(s) of Lading .
The Charterers are to issue single Letter of Indemnity in accordance with Owners' P and I Club wording signed by the Charterers and to be telexed  or faxed to the Owners prior to commence the discharging. The Original Letter of Indemnity is to be couriered to the Owners or Owners Agents and/or Master at discharging port(s) as soon as possible.

71. Vessel's Particular (All details about)

Name :  M.S. "BENEFIT WISDOM"   (Ex name : "kalinda")
          Flag Panama / Built in Mar.1985 / Classed at C.R. / Single Deck Log Bulk Carrier
          Call Sign : 3ESJ3 / Official No. : 15009-85-F / IMO No. : 8412948
          Inmarsat C : 435295810 BENE X   /   E-mail address : 435295810@stratosmobile.net



DWT in  Summer              23,542 metric tons on 10.068 metres
        Winter              22,864 metric tons on 9.89 metres
        Tropical            24,222 metric tons on 10.277 metrs
        Fresh water         23,500 metric tons on 10.29 metrs
        Tropica fresh water 24,200 metric tons on 10.59 mtres

L.O.A. / Beam / Depth : 155.906 / 24.60 /  13.90 metres

International G.R.T. / N.R.T. : 13,635.00 / 7,956.00
Suez G.R.T. / N.R.T. : 13,807.00 / 11,601.08
Panama G.R.T. / N.R.T. : 14,249.00 / 11,183.70

Number of Hold/Hatches :  4 Holds / 4 Hatches
Hatch Size : No. 1    − 14.40 x 11.20 metres
             Nos. 2/4 − 25.60 x 13.20 metres
Hatch covers Type : Steel Pontoon

Grain / Bale Capacity : 29,630.98 / 28,163.39 CBM
Holdwise Grain : No.1/2/3/4   4,150.10 / 8,729.11 / 8,715.61 / 8,036.16 CBM
          Bale : No.1/2/3/4   3,785.97 / 8,334.13 / 8,353.75 / 7,689.54 CBM

Strength : Tank Top  10.38 MT/M2
           Upper Deck  3.5 MT/M2
           Hatch Cover  2.4 − 3.0 MT/M2

Cargo Gears :  2 Deck Cranes x 25.5 long tons and 2 Thomson Derricks x 25  long tons

Speed / Consumption :
About 12.0 knots on about 18.0 MT I.F.O.9180CST) and about 1.0 MT M.D.O.
Under good weather condition upto/maximum Beaufort Scale Force 4 and Douglas
Sea State and no adverse current : −

Consumption in port :
Working : about 1.0 MT I.F.O. (180CST) and about 2.0 MT M.D.O.
Idle    : about 0.8 MT I.F.O. (180CST) and about 0.8 MT M.D.O.

Bunker Spec : I.F.O. 180 CST RME 25  /  M.G.O.(DMX) or M.D.O.(DMB)

Flat Tank Top Demension in each Hold :
          fore    /  aft    /  length
No.1 :  3.04  m / 18.48 m / 20.8 m
No.2 :  20.87   /  23.67  / 31.2
No.3 :  23.67   /  23.67  / 31.2
No.4 :  20.97   /   8.52  / 28

Aiir Draft : (summer draft)
 general cargo : 37.532 m
 timber (log) : 37.162 m

Moulded Depth : 13.9 m



Gear (Derricks & Cranes) Outreach :
boom length and S.W.L. at max radius on topping angle 15 degree:
No.1 (derrick) :  20.6 m  S.W.L.  21 L/T
No.2 (crane)  :  26.1 m            17 L/T
No.3 (crane)  :  26.1 m            17 L/T
No.4 (derrick) : 28.8 m            21 L/T

boom length and S.W.L. at max radius on topping angle 25 degree:
No.1 (derrick) :  19.3 m  S.W.L.  25 L/T
No.2 (crane)  :  24.5 m            25.5 L/T
No.3 (crane)  :  24.5 m            25.5 L/T
No.4 (derrick) :  27 m             25 L/T

Water Line to Hatch Coming : 13.38 metres in light ballast
                             10.40 metres in heavy ballast

Main Engine Maker / Type : Kobe Diesel Co.,Ltd / 6UES 52L
           Power x RPM : 6,250 PS X 119 RPM

Tank Capacity : I.F.O.  1,215.73 M3 (100%)     M.D.O.  150.49 M3 (100%)
                Water Ballast  6,464.13 M3 (100%)     Fresh Water  485.10 M3 (100%)

Number & Nationality of Master/Crew : Total 21 persons (C/E only Taiwan, Others all PRC)

P & I Club : Standard Steamship Owners P & I

SMC/DOC Issued & Valid date : SMC issued on 23rd Jan. 2003 valid till 27th May 2007
                              DOC issued on 07th Jan. 2003 valid till 14th May 2007

Last Dry Dock / Special Survey Date : 12th Apr. 2002 / 06th Apr. 2002
Next Dry Dock / Special Survey Date : 05th Apr, 2005 / 05th Apr. 2005

Holds ventilation type: mechanical

Owners to guarantee that Vessel is Log/Grain/Aussie/CO2 fitted.

72. ISM Clause
    The Owners guarantee that both the Vessel and "the Company" (as defined by ISM Code)
    are certified under the ISM Code and will remain so for duration of this Charter Party.
    If required, the Owners to provide the Charterers with a copy of the relevant Document of
    Compliance (DOC) and Safety Management Certificate (SMC). Notwithstanding anything to
    the company in this Charter Party, the Owners to remain fully responsible for any and all
    consequences of their failure to comply with the requirements of this clause.

73. Intermediate Hold Cleaning and Extra Work
    If the vessel's officer and crew perform extra work, as far as they are available and free from other
    duties and permitted by the port regulation, the Charterers shall pay a compensation for the works
    according to the tariff. However, the both parties agreed to review the tariff for succeeding year of
    the charter party if any.



Upon Completion of discharge of each cargo, the crew shall render customary assistance in cleaning cargo holds in preparation of next loading. The crew will endeavour to affect (sic) such cleaning as best as possible. The Owners shall not be responsible for any consequences arising from the fact that the crew has been employed in the clean and the vessel shall always remain on hire.

Intermediate hold cleaning to be performed by crew if requested by Charterers, provided time/sea conditions allowed and permitted by local regulations. Lumpsum U.S.$ 2,000.00 per voyage for crew's intermediate hold cleaning including removal/disposal of dunnages to be paid to Owners together with hire. All necessary cleaning materials to be supplied by the Charterers. Owners/crew to give their best cooperation in this respect, but are not responsible for such cleaning.

74. Smuggling
The Owners are familiar with the U.S. Customs Service Sea Carrier Initiative Agreement which is designed to discourage the smuggling of illegal contraband, including but is not limited to narcotics.

The Owners shall comply with the terms of the U.S. Customs Service Sea Carrier Initiative Agreement, and will take all security measures recommended by U.S. Customs, including those described in the sea carrier security manual.

Any delay, expenses and/or fine incurred on account of smuggling shall be for the Owners account if caused by the officers and/or crew, or shall be for the Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

Both the Owners and the Charterers warrant that they are signatories to the United States Sea Carrier Initiative Agreement with U.S. Custom Service.

75. Loading Logs Materials
The vessel to be fully log fitted as on board on delivery of this charter. The Charterers to arrange/supply lashing materials, (except ordinary tear and wear in which case Owners to arrange/supply at their account.) log loading and discharging materials shall be at their account throughout this charter.
In any case vessel to be redelivered with about same quantity of loading and lashing materials as on delivery.

76. Cargo Securing Manual
The Owners guarantee the Vessel to have on board CSM (Cargo Securing Manual) comply with 1994 amendments to SOLAS, 1974 regulations VI/5.6 and VII/6.6. Notwithstanding anything to the company in this Charter Party, the Owners to remain fully responsible for any and all consequences of their failure to comply with the requirements of this clause.

77. Owners' Expenses
Charterers are allowed to withhold USD 500 per port from the hire payment for estimated Owners' expenses.

78. Certificates
Owners confirm that all certificates on board must/will comply with international trading and local regulations/requirements including ISPS, ISM / Safety Management Certificates, failing which Owners to be responsible for all consequences damages it may incurred.



# ATTACHMENT (AS TO CLAUSE-38)

### New Jason Clause

In the event of accident, danger damage, or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible by statute, contract or otherwise, the Goods, shipper, consignee, or owner of the Goods shall jointly and severally contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the Goods. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully and in the same manner as if the salving ship or ships belonged to strangers. Such deposit as the Carrier or his agent may deem sufficient to cover the estimated contribution of the Goods and any salvage and special charges thereon shall, if required, be made by the Godds, shipper, consignee, or owner of the Goods to the Carrier before delivery.

### New Both to Blame Collision Clause

If the Vessel comes into collision with another ship as a result of the negligence of the other ship, and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owner of the Goods carried hereunder shall indemnify the Carrier against all loss or liability which might be incurred directly or indirectly to the other or non-carrying ship or her owner in so far as such loss or liability represents loss of or damage to his Goods or any claim whatsoever of the owner of the said goods, paid or payable by the other or non-carrying ship or her owner to the owner of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owner as part of his claim against the carrying Vessel or the Carrier. The foregoing provisions shall also apply where the owner, operator or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

### Chamber of Shipping Clause  Paramount

All the terms, provisions and conditions of the Carriage of Goods by Sea Act 1992, and the Schedule thereto, are to apply to the contract contained in this Bill of Lading, and the Owners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act, and the Schedule thereto, as if the same were herein specifically set out. If, or to the extent that, any term of this Bill of Lading is repugnant to or inconsistent with anything in such Act or Schedule it shall be void.

### U.S.A Clause Paramount

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Owners of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent but no further.



### Canadian Clause Paramount

This bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods Act, 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Owners of any of its rights or immunities, or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading is repugnant to said Act to any extent, such terms shall be void to that extent, but no further.

### Baltime 1939 War Clause

(A)  The Vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which in dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution, civil war, civil commotion or the operation of inernational law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interfernce of any kind Whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler,

(B)  Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the Vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 15 hire to be paid for all time lost including any lost owing to loss of or injury to the Masteer, Officers, or Crew or to the action of the Crew in refusing to proceed to such zone or to be exposed to such risks.

(C)  In the event of the wages of the Master, Officers and/or Crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any or the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefor, such account being rendered monthly.

(D)  The Vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.

(E)  In the event of the nation under whose flag the Vessel sails becoming involved in war, hostilities, warlike operations, revolution, or civil commotion, both the Owners and the Charterers may cancel the Charter and unless otherwise agreed, the Vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of section (A) from reaching or entering it, then at a near open and safe port at the Owners option, after discharge of any cargo on board,

(F)  If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a devistion.



Tokyo, 17th March 2005

# ADDENDUM

----------

TO

## M.S. "BENEFIT WISDOM"

### CHARTER PARTY DATED TOKYO, 16TH MARCH 2005

DUPLICATE

With reference to the captioned Charter Party, it is this day mutually understood and agreed between SEKIHYO LINE LTD., Tokyo as Owners and SAMSUN LOGIX CORPORATION., Seoul as Charterers that :-

-Hire rate : USD 14,950 per day prorata including overtime in case of period 11/13 months
USD 13,200 per day prorata including overtime in case of period 24/26 months

All other terms, conditions and exceptions of the Charter Party shall remain unaltered in full force.

Owners                                                    Charterers

SEKIHYO LINE LTD.

For and on behalf of
SAMSUN LOGIX CORPORATION.

Manager

Authorized signature

Tokyo, 16th October 2006



## ADDENDUM NO. 3

TO

### M.V. "BENEFIT WISDOM"

CHARTER PARTY DATED TOKYO, 16TH MARCH 2005
ADDENDUM NO.2 DATED TOKYO, 25TH OCTOBER 2005



With reference to the captioned Charter Party and Addendum, it is this day mutually understood and agreed between SEKIHYO LINE LTD., Tokyo as Owners and SAMSUN LOGIX CORPORATION., Seoul as Charterers that :-

- Time charter period is extended or e(1) year.

- Total duration : Minimum 36 months - Maximum 38 months at Charterers' option.
  (Redelivery time to be from end/April to end/June, 2008)

- Compensation clause :
  In case this charter party to be cancelled basis on lawful condition (Case ship is not serviceable phsically or lawfully or ship is lost or war as per clause 79 of the c/p), Charterers will compensate the difference between hire actually paid at USD 12,550 and hire calculated basis USD 13,200 (Nov. 01, 2006 - Apr. 30, 2007) and USD 12,400 (May 01, 2007 - Apr. 30, 2008) upto the moment of lawful cancellation of this Charter Party and/or phsical redelivery.

- Dry docking clause (Rider clause 66) :
  The Owners have the option to place the vessel in dry-dock during the currency of this charter at a convenience time and place to be mutually agreed between the Owners and the Charterers. However the Owners shall notify the Charterers of the intention of such dry-docking and/or periodical survey with two(2) months prior notice except emergency case. Owners intension of drydock place would be preferred in Shanghai to South China range with period from April to December 2007.
  Charterers shall endeavor to bring vessel to this range.

- Padeye clause :
  Charterers have option to weld padeyes on deck/holds at Charterers' time/expenses and same to be removed prior to redelivery at Charterers' time/expenses but Charterers have option to redeliver vessel without removing padeyes paying USD 10 per padeye.

- Intermediate hold cleaning & extra work clause (Rider clause 49 & 73) :
  Charterers to pay crew's intermediate hold cleaning and hatch operation fee to Master directly.

All other terms, conditions and exceptions of the Charter Party shall remain unaltered in full force.

Owners

**SEKIHYO  LINE  LTD.**

Manager

Charterers

For and on behalf of
SAMSUN LOGIX CORPORATION.

Authorized signature

EXHIBIT
B

**SAVALAK, VALARIE**

| | |
|---|---|
| **From:** | J.B. Chartering Corp. [jb@jbchart.co.kr] |
| **Sent:** | Thursday, November 15, 2007 1:39 AM |
| **To:** | Handy Unit III |
| **Subject:** | MV BENEFIT WISDOM / JH SHPG - CHTRS' CLAIM AMOUNT |

J.B. Chartering Corp., Seoul.
Email jb@jbchart.co.kr or jbchart@kornet.net
Tel: 82-2-723-0240,    Fax: 82-2-723-0244
------------------------------------------

Re : MV BENEFIT WISDOM / JH SHPG - CHTRS' CLAIM AMOUNT

1. PLS BE ADVD CLAIM AMOUNT FM J H SHIPPING & TKB AS FLWS

AA. FM TKB
   - LOSS OF EARNING : USD 968,296.87
   - DETENTION CHARGE AT TEESPORT : USD 378,000

BB. FM J H SHIPPING
   - OVER PAID HIRE + BUNKER VALUE : USD 401,059.10
   - LOSS OF EARNING : USD 290,915.63

CC. TOTAL CLAIM AMOUNT FM J H SHIPPING & TKB : USD 2,038,271.60

2. PLS NOTE FLWGS
   - ABOVE AMOUNT EXCLUDED ANY COST / INTERESTS N ETC
   - NOTED TKB APPLIED WITHDRAWAL TIME N BUNKER ROB BSD ON DEP PORTSMOUTH
   - NOTED TKB APPLIED BUNKER VALUE BSD ON THEIR LATEST SUPPLIED PRICE


------------------------------------------
B.RGDS  BH AHN     (MOB 82-11-9035-3496)

1

EXHIBIT

C

 **J.H. SHIPPING CO., LTD**

9th FL., TAEHWA-BLDG. 194-27, INSA-DONG, JONGNO-GU, SEOUL, KOREA
TEL : 82-2-2135-2001  FAX : 82-2-2135-2008   e-mail : jhship@jhship.kr  TELEX : K35200 JHSHIP

## STATEMENT OF ACCOUNT

REF NO:   BIZIII-071114-01
DATE :   2007-11-14

**TO: SAMSUN LOGIX**

| ITEM | DESCRIPTION | | |
|------|-------------|--|--|
| RE | HIRE S.O.A OF MV. BENEFIT WISDOM | ILOHC | 2500/3500(LAST) |
| DELIVERY | DLOSP JETTY, BAHRAIN 13:48UTC 1ST MARCH., 2007 | INTERMEDIATE | |
| B.O.D | IFO : 158.24 MT   MDO : 37.66 MT | C.V.E/MONTH | 1500 |
| REDELIVERY | | | |
| B.O.R | IFO :    MT  MDO :    MT | | |

TOTAL DURATION         20.679167  DAYS
NET DURATION           20.679167  DAYS
OFF-HIRE                0.000000  DAYS

| ITEM | DESCRIPTION | | | | | Dr | Cr |
|------|-------------|--|--|--|--|----|----|
| OVER PAID HIRE | USD | 13,700 | X | | 20.679167 | $283,304.58 | |
| | | 2007-09-06 21:30 | | UTC | | | |
| | | 2007-09-27 13:48 | | UTC | | | |
| LESS ADD COMM | 2.50% | | | | | | $7,082.61 |
| BOR | IFO | 679.190 MT | X | USD | 401 | $272,355.19 | |
| | MDO | 56.900 MT | X | USD | 742 | $42,219.80 | |
| | V.A.T. ON ABOVE | | | | | $31,457.50 | |
| INTERMEDIATE HOLD CLEANING CHARGE | | | | | | | $9,000.00 |
| | (WHICH DID NOT DELIVERED TO MASTER) | | | | | | |
| OVER PAID C/V/E | 1,500 | PMPR | | | | 1,033.96 | |
| OWNRS REFUND | | | | | | | $213,229.31 |
| SUB TOTAL | | | | | | $630,371.03 | $229,311.92 |
| BALANCE DUE TO OWNERS | | | | | | ($401,059.10) | $0.00 |
| GRAND TOTAL | | | | | | $229,311.93 | $229,311.92 |

OUR BANK ACCOUNT:
KOREA  EXCHANGE  BANK INSADONG BRANCH,SEOUL,KOREA
BENEFICIARY : JH SHIPPING CO.,LTD.
SWIFT CODE : KOEXKRSE
ACCOUNT NO. 650-004633-387

*J.H. SHIPPING CO., LTD.*

**From:** Samsun Logix/SLT J.C.RYU [jcryu@samsun.co.kr]
**Sent:** 13 November 2007 00:54
**To:** winston.kwek@rajahtann.com
**Cc:** Cox, Jeff; Strategy & Legal Team
**Subject:** MV Benefit Wisdom / Dooyang [{DOC/REF:980315/2}]

**Importance:** High
Dear Winston,

In addition to my earlier message of this morning, I think below message (which I believe I have already forwarded to you before) shall be very assistant to you.

Please refer to below message.

Regards

Ryan Ryu

---

**From:** Samsun Logix/STM U.S.GANG
**Sent:** Tuesday, November 13, 2007 9:15 AM
**To:** Samsun Logix/SLT J.C.RYU
**Subject:** FW: ** FW: MV Benefit Wisdom / Dooyang
**Importance:** High

---

**From:** Samsun Logix/STM U.S.GANG
**Sent:** Thursday, October 25, 2007 10:23 AM
**To:** Strategy & Legal Team
**Cc:** hu3
**Subject:** ** FW: MV Benefit Wisdom / Dooyang

TO : STRATEGE & LEGAL TEAM

ÇÏ±â NEXT TIME CHRTRS (SAMSUN--->DOOYANG----> Chang Sung : LAST SUB T/C CHRTRS )' CLAIM AMOUNT.

B.RGDS / US GANG

---

**From:** J.B. Chartering Corp. [mailto:jb@jbchart.co.kr]
**Sent:** Thursday, October 25, 2007 9:55 AM
**To:** Handy Unit III
**Subject:** MV Benefit Wisdom / Dooyang

J.B. Chartering Corp., Seoul.
Email jb@jbchart.co.kr or jbchart@kornet.net
Tel: 82-2-723-0240,    Fax: 82-2-723-0244
----------------------------------------

Re: MV Benefit Wisdom / Dooyang

We refer to the owners' refusal to delivery of the vessel which is a clear and fundamental breach of the terms of the

EXHIBIT

D

charterparty dated on 21st August 2007. In this circumstance, the charterers consider that the owners' conduct amounts to a repudiatory breach of the charterpaty. Accordingly, the charterers notify the owners that they have accepted the owners' repudiatory conduct as such, so that the charterpary is no longer in effect.

As a result of the owners' repudiatory breach of the charterparty, the charterers have suffered loss and damage including the liability to the sub-charterers and hold the owners responsible for the same. The charterers' estimated claims arising from the owners' conduct is USD2,305,350 as following ;

AA) The charterers' loss
- The hire rate with the owners          : USD21,255.0(USD21,800, 2.5% Commission)
- The hire rate with the sub-charterers  : USD24,062.5(USD25,000, 3.75%Commission)
- The charter duration : 180days
- Dooyang's loss : USD505,350(USD2,807.5*180)

BB) The sub-charterers' claim against Dooyang
- The hire rate with Dooyang          : USD25,000
- The prevailing market rate          : USD35,000 (On the basis of the date on 4th Oct. 2007 when the owners notified that
they could not deliver the vessel)
- The charter duration : 180days
- The sub-charterers' loss : USD1,800,000(USD10,000*180)

CC) Total : USD2,305.350

In the circumstances, the charterers hereby request the owners to provide security of USD3,500,000 in respect of this claim amount plus interest and costs by
2nd November 2007. Failing which, the charterers fully reserve their right to attach the owners' assets in order to secure their claim.

We look forward to hearing from you.

-----------------------------------------
B.RGDS BH AHN     (MOB 82-11-9035-3496)



**Samsun Logix Corporation**

5-6F,Lee Ma Bldg.146-1, Soosong Dong, Chongno Ku,Seou

Tel.82-3998-500 Fax. 82-2-3998-570 Telex. K25534

## CLAIM INVOICE
## MV. BENEFIT WISDOM

| | | |
|---|---|---|
| MESSERS. | SEKIHYO LINE LTD | |
| C/O. | SEOKANG SHIPPING | 2007-11-19 |
| CHARTERERS | SAMSUN LOGIX CORPORATION | |
| C/P DATE | 2005-03-16 | |

REDELIVERY O/A (ACTUAL : RYTG)    2007-09-06    21:30 GMT
OVERPAID TO                       2007-09-30    02:30 GMT

BUNKER ON DELY                IFO    35.510 MT       CP PRICE IFO    $230.00
               (SUPPLY AT GUANGZHOU)  270.000 MT                   IFO    $309.00
                              MDO    31.990 MT                     MDO    $430.00

BUNKER ON REDELY              IFO   679.190 MT       CP PRICE IFO
                              MDO    56.900 MT                     MDO

CHARTERED DURATION              23.208333 DAYS
HIRE                            12.550 DIOT

| | P A R T I C U L A R S | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| 1 | HIRE (ESTD OVERPAID) | 23.208333 DAYS | X | $12,550.00 | $291,264.58 | |
| 2 | ADDCOMM | $291,264.58 | X | 2.50% | | $7,281.61 |
| 3 | REDEL BUNKER (ABOUT) | | | | | |
| | IFO | 679.19 MT | X | $401.00 | $272,355.19 | |
| | MDO | 56.90 MT | X | $742.00 | $42,219.80 | |
| 4 | COM/VIC/ENT ($1500 MONTHLY) | | | | | |
| | ($1500/30DAYS) X 23.208333DAYS | | X | $1,500.00 | $1,160.42 | |
| 5 | INTER H/CLEANG | | | $9,000.00 | | $9,000.00 |
| 6 | REMITTANCE MADE(11/OCT/07) | | | | | $230,325.90 |
| 7 | CLAIM AMOUNT FM CHRTRS(JH SHPG+TKB) | | | | $2,006,814.10 | |
| 8 | CLAIM AMOUNT(LOSS OF EARNG) BETWEEN SAMSUN AND JH SHPG | | | | $81,395.21 | |
| 9 | CLAIM AMOUNT FM NEXT CHRTRS(DOOYANG+CHANG SUNG) | | | | $2,305,350.00 | |
| 10 | CLAIM AMOUNT(LOSS OF EARNG) BETWEEN SAMSUN AND DOOYANG | | | | $1,600,563.75 | |
| 11 | CLAIM AMOUNT ON BALACE PERIOD(FM 01/JUN-30/JUN/2008) : TO BE ADDED | | | | | |
| | SUB TOTAL | | | | $6,601,123.05 | $246,607.51 |
| | BALANCE DUE TO CHARTERER | | | | | $6,354,515.54 |
| | GRAND TOTAL | | | | $6,601,123.05 | $6,601,123.05 |

YOURS FAITHFULLY

KOOKHIN BANK, MYEONGDONG CORP BUSINESS DEPT. SEOUL, KOREA
AC/ NO : 12366805100013
SWIFT CODE : CZNBKRSE
SAMSUN LOGIX CORPORATION

U.S GANG / MANAGER
SAMSUN LOGIX CORPORATION

EXHIBIT
E